IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JASON SILVER )<br>)<br>   **Plaintiff,** )<br>)<br>v. )<br>)<br>)<br>TOWNSTONE FINANCIAL, INC., )<br>BARRY STURNER and DAVID )<br>HOCHBERG )<br>)<br>   **Defendants.** ) | Case No. 14-cv-1938 |

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jason Silver, by and through counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and to Rule 56.1(a)(3) of the general rules of the United States District Court for the Northern District of Illinois, submits the following Statement of Undisputed Material Facts in support of his Motion for Summary Judgment.

**I. PARTIES**

1. Defendant Townstone Financial, Inc. ("Townstone") is a Chicago-based company that sells home mortgage loans to customers throughout the Chicagoland area. Ex. A at 16:7-13, 19:11-13. Defendant Barry Sturner ("Sturner") is, and at all relevant times was, the Chief Executive Officer ("CEO") and owner of Townstone. Ex. A at 6:8-21. Defendant David Hochberg ("Hochberg") was, at all relevant times, the President and a co-owner of Townstone. Ex. B at 37:15-38:2; Ex. A at 6:17-21.

2. Plaintiff Jason Silver ("Plaintiff" or "Silver") was hired as a full-time sales employee at Townstone from on or about May 24, 2012. Ex. C. Plaintiff worked as a full

1

time sales employee from May 24, 2012 until his employment was terminated on or about February 6, 2014. Ex. D.

## II. TOWNSTONE'S GENERAL BUSINESS OPERATIONS

3. Sturner and Hochberg founded Townstone Financial, Inc., in 2002. Ex. A at 6:12-21. From 2002 until July of 2015, Sturner owned 65% and Hochberg owned 35% of Townstone. Ex. A at 7:17-8:8. Hochberg was bought out in July 2015 and left Townstone. Ex. A at 7:23-8:2.

4. At all relevant times, Townstone maintained its office at 1141 West Randolph, Chicago, Illinois 60607. Ex. A at 19:8-17.

5. Plaintiff and other loan officers worked at Townstone's Chicago office. Ex. B at 44:11-18; Ex. A at 19:20-20:6; Ex. E at 9:13-16, 10:21-11:4; Ex. F at 19:2-4, 26:17-20; Ex. G at 15:4-6, 22-24, 34:21-35:4; Ex. H at 9:21-10:15; Ex. I at 26:19-27:11; Ex. J at 13:22-14:2.

6. Townstone's business is to sell home mortgage loans. Ex. A at 16:7-13.

7. During Plaintiff's employment, Hochberg hosted a radio show on behalf of Townstone Financial. Ex. F at 15:5-6; Ex. G at 30:17-20; Ex. H at 21:8-22:3; Ex. I at 22:9-13.

8. 90 to 95% of Townstone's potential clients, or "leads," were generated by Hochberg and his radio show. Ex. B at 59:10-59:20.

9. When leads came in from the radio show, Hochberg would assign the leads to Townstone loan officers, including Plaintiff. Ex. K at 79:22-24, 131:7-8.

10. Townstone employed Plaintiff and other loan officers to follow up on these leads and sell loans. Ex. A at 16:15-19; Ex. E at 9:3-8; Ex. F at 11:13-21; Ex. G at 16:16-19; Ex. H at 14:24-15:2; Ex. I at 7:10-23.

11. Defendants required loan officers to be in the office by 8:30am each morning or risk forfeiting all leads for the day. Ex. L.[1]

12. Most loan officers, including Plaintiff, received the majority of their leads from Townstone – namely Hochberg's radio show. Ex. K at 79:22-24; Ex. B at 58:24-59:20; Ex. A at 27:6-16; Ex. E at 10:11-20; Ex. F at 14:23-15:6, 15:17-24, 17:8-13; Ex. G at 88:13-18; Ex. H at 15:18-22; Ex. I at 9:6-14.

13. Defendants sent Plaintiff more than 1,000 emails after normal business hours and on weekends. Many of these emails directed Plaintiff to follow up with potential clients right away. *See, e.g.,* Ex. M (examples of email leads).

14. At Defendants' office, loan officers were provided with a designated cubicle or desk, a key fob to obtain access to the office, and necessary office equipment such as a telephone and computer. Ex. E at 8:18-9:1; Ex. F at 19:18-24; Ex. G at 15:14-21; Ex. H at 10:3-15, 13:16-20; Ex. I at 26:19-21; Ex. J at 28:4-12.

15. Townstone loan officers, including Plaintiff, primarily worked from inside the Townstone offices from Monday through Friday. Ex. K at 79:22-24; Ex. N at ¶ 4; Ex. B at 48:1-5; Ex. J at 22:14-23:7.

16. When working from home in the mornings, evenings, and on weekends, Plaintiff could access his Townstone computer remotely using Townstone's virtual private network ("VPN"). Ex. A at 183:12-17.

---

[1] Any email exhibits that are not Bates-stamped were produced by Defendants in their native format and without Bates numbers during discovery.

**III.   DEFENDANTS' POLICIES**

17. Sturner primarily created all of Townstone's policies. Ex. B at 39:12-18; Ex. A at 13:2-6. For example, Sturner created or authorized the creation of, and updates to, the Townstone employee handbook. Ex. B at 39:19-24; Ex. A at 13:2-6, 166:1-4.

18. Sturner would notify loan officers of changes in Townstone policies via email. Ex. A at 12:24-13:1; Ex. B at 40:1-11. These emails were saved in a folder on Townstone's internal server. Ex. A at 13:7-19.

19. Defendants had policies requiring Townstone loan officers, including Plaintiff, to be at their desks in the Townstone offices at given times, including before normal business hours. *See* Ex. L, Ex. O, Ex. P, Ex. Q, Ex. R, Ex. S.

20. In fact, Townstone had a policy of requiring Plaintiff and other loan officers to work on the weekends. Ex. T.

21. Townstone had a policy of requiring Plaintiff and other loan officers to forward their office phones to their personal cell phones when they were not in the office. Ex. U.

22. Sturner had a policy of requiring Plaintiff and other loan officers to respond to every email he sent. Ex. V.

23. Townstone had a policy mandating the order in which loan officers organized papers in their loan files. Ex. W.

24. Defendants expected Plaintiff and other loan officers to comply with Townstone rules and Defendants' own directives. Ex. A at 32:7-15, 145:16-21, 148:21-24, 167:11-16; Ex. B at 82:2-4.

25. Loan officers, including Plaintiff, played no role in creating any of Townstone's policies. Ex. E at 13:12-14; Ex. F at 14:5-7; Ex. I at 20:16-22; Ex. J at 24:2-4.

### IV. DEFENDANTS' CLASSIFICATION OF PLAINTIFF AS EXEMPT

26. Plaintiff was classified by Defendants as exempt and was not paid overtime when he worked more than 40 hours per week. Ex. A at 64:14-19, 62:7-9, 97:19-21.

27. Defendants classified all of its loan officers as exempt from the FLSA and did not pay them overtime when they worked more than 40 hours per week. Ex. A at 66:6-8; Ex. E at 52:11-13; Ex. F at 23:18-24; Ex. G at 34:11-13; Ex. H at 31:18-24; Ex. I at 32:5-7.

28. Sturner testified that his only bases for classifying Plaintiff as exempt are advice Sturner sought from an attorney in 2011 whose name he cannot remember and compliance webinars Sturner watched but about which he cannot remember any details. Ex. A at 77:23-80:6, 81:13-17.

29. In deciding to classify Plaintiff as exempt, Defendants did not consult with the Department of Labor, perform any independent legal research, or perform any analysis to specify what percentage of time Plaintiff, or any other loan officers, spent on particular tasks. Ex. A at 82:18-83:18.

### V. PLAINTIFF'S PAY

30. As a full-time sales employee, Plaintiff's was paid a low base salary and commissions on the loans he sold. Ex. A at 31:2-4; Ex. B at 63:4-10; Ex. K at 163:23-24, 165:22-166:1. For example, in 2013, Plaintiff's commissions totaled $110,700, and he received $38,500 in base salary. Bates No.T00136.

31. Loan officers were evaluated and compensated based upon their sales volume. *See, e.g.,* Ex. A at 95:11-13 (Plaintiff's loan production was as good as other loan officers); Ex. B at 56:10-17 (Plaintiff's loan production was good); Ex. I at 8:7-12 (commissions were determined based upon number of loans sold).

5

32. For each loan product Plaintiff sold, he would receive a flat-fee commission. Ex. B at 63:4-13.

33. Plaintiff was never paid overtime at Townstone. Ex. A at 62:7-9; 97:19-21;

## VI. PLAINTIFF'S DUTIES

34. Plaintiff typically worked from Defendants' offices Monday through Friday. Ex. K at 79:22-24; Ex. N at ¶ 9; Ex. B at 48:1-5; Ex. E at 23:16-18; Ex. F at 21:4-6; Ex. G at 36:4-7; Ex. H at 30:14-16; Ex. I at 35:6-8; Ex. J at 22:10-23:7.

35. Plaintiff would work from home in the evenings and on weekends. Ex. K at 197:5-7; Ex. N at ¶ 7.

36. Plaintiff also worked Townstone's weekend radio show. Ex. B at 49:20-22.

37. Plaintiff estimates that he worked 50-60 hours per week that he worked at Townstone. Ex. X at ¶ 20.

38. Townstone loan officers', including Plaintiff's, primary duty was selling loan products to Townstone customers. Ex. K at 143:10-11 ("The core duty is to provide a loan if [the clients] qualify for a loan"); Ex. E at 9:3-8; Ex. G at 40:11-12 (The Witness: "Sales, I believe, is what I am in"); Ex. H at 14:24-15:2; *see also, e.g.,* Ex. C; Ex. Y.

39. As part of his sales duties, Plaintiff would receive leads from Townstone and contact such potential customers; collect required financial information, including information about income, employment history, assets, investments, home ownership, debts, credit history, prior bankruptcies, judgments, and liens. Ex. K at 131:7-132:16, 133:8-13; Ex. N at ¶ 4; Ex. B at 59:21-62:2; Ex. A at 33:3-34:24.

6

40. Plaintiff would then run credit reports and enter the collected financial information into Defendant's Encompass computer program that identified which loan products could be offered to the customer. Ex. K at 131:7-132:16, 133:8-13.

41. Next, Plaintiff discussed with customers the terms and conditions of particular loans, trying to match the customers' needs with one of Townstone's loan products. Ex. K at 131:7-132:16, 133:8-13.

42. The interest rate available for each Townstone loan product was based on the rates that banks and investors were offering on a particular date. Ex. K at 136:24-137:2.

43. Potential interest rates that Silver could offer a customer were also based upon certain parameters set by Sturner and Hochberg. Ex. K at 244:6-7; *see also* Ex. K at 238:15-18 (Plaintiff was supposed to make Townstone approximately 2% profit on every loan).

44. If the customer accepted Townstone's offered interest rate, Plaintiff, like all other Townstone loan officers, could "lock" the loan, thereby allowing the customer to receive the same interest rate when the loan closed a certain number of days later. Ex. K at 210:11-19.

45. Sturner required Plaintiff and to send all loan files to Sturner for review and ultimate approval. Ex. K at 210:18; Ex. N at ¶ 4.

46. Plaintiff would compile customer documents for forwarding to an underwriter or loan processor and finalize documents for closings. Ex. K at 131:7-132:16, 133:8-13; Ex. N at ¶ 4.

47. Plaintiff performed the same tasks when working from home as he did while working in Townstone's offices. Pl. Resp. to Def. First Interrogatories, ¶7.

48. Townstone loan officers, including Silver, did not play any role with regards to Townstone's accounting, hiring or firing, supervising, dealing with vendors, human

resources, selecting software, or setting policies on behalf of Townstone Financial. Ex. B at 63:19-64:23; Ex. E at 13:5-14:17; Ex. F at 13:22-14:18, 31:18-20; Ex. G at 21:4-22:5; Ex. H at 19:12-21:1; Ex. I at 18:6-20, 20:11-22, 25:12-26:8; *see also* Ex. A at 29:9-12 (Sturner was "responsible for anything that…would be related to the operations of Townstone. David Hochberg and I ran the company together"), 28:22-30:3; Ex. B at 39:12-41:1 (Sturner, occasionally along with Hochberg, handled the accounting, budgeting, human resources, hiring, firing, and disciplining of staff, purchasing and advertising at Townstone).

49. Likewise, Townstone loan officers, including Silver, did not have the authority to formulate, affect, interpret, or implement management policies or operating practices. Ex. E at 13:12-14; Ex. F at 14:5-7; Ex. I at 20:21-22.

50. Similarly, Townstone loan officers, including Silver were not responsible for conducting any assignments or performing work that affected any day-to-day business operations at Townstone. Ex. E at 86:16-87:3; Ex. F at 48:10-14; Ex. G at 40:5-11; Ex. H at 20:21-21; Ex. I at 54:1-18, 54:19-57:1

51. Further, Plaintiff did not participate in advertising or marketing on behalf of Townstone. Ex. B at 73:8-22; Ex. A at 39:4-11.

52. Even loan officers' business cards were provided by Townstone. Ex. G at 29:6-8.

53. Sturner required all Townstone loan officers, including Plaintiff, to perform secondary market research for Sturner in order to lock loans. Ex. K at 244:10-12; Ex. B at 65:16-21.

54. At Townstone, secondary market research meant that Sturner would set certain parameters or categories for which loan officers had to determine the best interest rate of the day among three or four institutional investors. Ex. K at 134:18-135:22; Ex. E at 45:6-13.

## VII. DEFENDANTS DID NOT KEEP ANY TIME RECORDS

55. Defendants failed to maintain any time records showing the actual time worked by Plaintiff. Ex. A at 52:1-3; Ex. B at 44:4-10.

56. Both Sturner and Hochberg admitted that they were aware of Plaintiff performing work after normal business hours and on the weekends. Ex. A at 90:17-91:12; Ex. B at 50:7-10.

## VIII. PLAINTIFFS' TERMINATION

57. Throughout his employment, Plaintiff complained about working too many hours without adequate compensation. Ex. K at 48:14-49:14.

58. Plaintiff also complained about having to forward his office line to his personal cell phone, particularly because Defendants did not pay his cell phone bill, yet expected him to work while he was out of the country on vacation. *See, e.g.,* Ex. Z.

59. Plaintiff complained about forwarding his office line to his personal cell phone approximately ten times throughout his employment at Townstone, and each time, Plaintiff was threatened with termination. Ex. N at ¶ 19.

60. On February 6, 2014, Plaintiff and Sturner exchanged a series of emails in which Plaintiff complained about working all hours of the night and having his office line forwarded to his personal cell phone without his permission. Ex. AA.

61. During the email exchange, Sturner set a meeting for following day at 10:30am. Ex. AA.

62. However, Sturner called and fired Plaintiff on the evening of February 6, 2014, at approximately 7:09pm. Ex. BB.

63. Prior to this litigation, Defendants gave no reason for Plaintiff's termination. *See, e.g.,* Ex. D.

64. In their Answer, Defendants stated generally that Plaintiff "was a problem employee." Dkt. No. 30 at ¶ 2.

65. In Defendants' Responses to Plaintiff's First Set of Interrogatories, Defendants stated that Plaintiff was fired "because of his chronic absenteeism." Ex. CC at ¶ 16. Defendants further stated that "Plaintiff harassed at least one female employee, and made comments about the sexual orientation of at least one other employee, and was generally difficult to work with and was disruptive in the workplace." *Id*.

66. At his deposition, Sturner testified under oath that Plaintiff was fired "due to compliance issues that we had there in the beginning of January." Ex. A at 106:23-107:1. Sturner stated that compliance issues were the sole reason Plaintiff was fired. *Id*. at 107:9-11 (Q: Were there any other reasons why you terminated Mr. Silver? A: No.). Sturner then changed his answer and testified that Plaintiff was fired for a "host of things going together." Ex. A at 132:23-133:17. Later still, Sturner testified that there was not one specific reason for Plaintiff's firing. Ex. A at 198:9-19.

67. Sturner also testified that he did not find out about any alleged problems between Plaintiff and any female Townstone employee until after he fired Plaintiff. Ex. A at 109:21-111:1. Sturner also testified that Plaintiff was not fired for any alleged harassment of Townstone employee Lindsey Teicher. Ex. A at 113:20-114:3 (Q: …let me ask you this. When was it that you found out that [Lindsey Teicher] had complained to other loan officers? A: I don't know the exact date, but Jason Silver was already gone. Q: So that wasn't a basis for his termination – A: No.)

10

68. Hochberg testified under oath at his deposition that he did not even know whether Townstone fired Plaintiff or whether Plaintiff had resigned. Ex. B at 82:15-21, 83:11-13, 84:4-9.

69. After Defendants' depositions, they produced Supplemental Responses to one of Plaintiff's Interrogatories. *See* Ex. FF. In the supplemental responses, Defendants stated under oath "that Plaintiff was terminated because Plaintiff failed to follow Townstone's policies regarding compliance with state and federal laws" and "due to his chronic absenteeism." Ex. FF at ¶ 16.

70. The Townstone employee handbook outlines a four-step corrective action process to occur before an employee is fired for unacceptable work performance or conduct. Ex. DD at § 2.4.

71. Defendants did not follow their corrective action process with respect to Plaintiff. *See, e.g.*, Ex. EE (Defendants' counsel indicating that corrective action documents do not exist).

Dated:    March 28, 2016                    Respectfully submitted,

                                                                      */s/ Ryan F. Stephan*
Ryan F. Stephan
STEPHAN ZOURAS, LLP
205 N. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
(312) 233-1550
(312) 233-1560 f

**ATTORNEYS FOR PLAINTIFF**

11