UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON SILVER | ) |
| | ) |
| Plaintiff, | ) Case No. 14-cv-1938 |
| | ) |
| v. | ) Judge Sharon Johnson Coleman |
| | ) |
| TOWNSTONE FINANCIAL, INC., BARRY STURNER, and DAVID HOCHBERG, | ) ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jason Silver brought this action against Townstone Financial, Inc., Barry Sturner, and David Hochberg, alleging that the defendants, his former employers, did not pay him overtime in violation of the Fair Labor Standards Act and the Illinois Minimum Wage Law and that they retaliated against him for asserting his right to overtime pay in violation of the Fair Labor Standards Act. The defendants filed a motion for summary judgment, and Silver filed a cross-motion for summary judgment. For the reasons set forth below, the defendants' motion [54] is granted in part and denied in part and Silver's motion [51] is denied.

**Background**

The following facts are undisputed. Silver was employed by Townstone as a loan officer from May 24, 2012 through February 6, 2014. (Dkt. 65 ¶ 1). Townstone is owned by Sturner and Hochberg, who are its CEO and President respectfully. (*Id.* ¶¶ 3, 4; dkt. 66 ¶ 1). Townstone is a mortgage banker that originates mortgage loans and subsequently sells those loans to investors on the secondary loan market. (Dkt. 65 ¶ 6). Each investor publishes rate sheets indicating how much it will pay for particular types of loans at particular interest rates, and Townstone uses those rate sheets to determine the terms of the loans that it makes. (*Id.* ¶ 7). Townstone also brokers loans between consumers and other financial institutions for a commission. (*Id.* ¶ 8).

1

A loan officer's primary duty was to sell loans. (Dkt. 74 ¶ 2). As such, loan officers would contact or meet with potential customers and collect required financial information such as their income, employment history, assets, investments, home ownership, debts, credit history, prior bankruptcies, judgments, and liens. (Dkt. 66 ¶ 39). Next, a loan officers would run the potential client's credit reports and enter the collected financial information into Townstone's Encompass computer program. (*Id.* ¶ 40). It was then up to each loan officer to determine the interest rate to offer the customer in light of the rate sheets that Townstone received from the secondary loan market investors. (Dkt. 65 ¶¶ 20, 23). If the customer accepted the offered interest rate, loan officers could "lock" the loan, allowing the customer to receive that interest rate when the loan subsequently closed. (Dkt. 66 ¶ 44). Sturner and Hochberg determined parameters within which loan officers could lock loans, and required that loan officers quote clients interest rates that would yield no less than two-percent profits. (Dkt. 65 ¶¶ 24, 25). Once a loan had been locked, the loan officer would then compile and finalize the customer's documents for forwarding to an underwriter or loan processor. (Dkt. 66 ¶ 46). One of the methods by which Townstone generated potential clients, or "leads," was through a radio show that Hochberg hosted on Townstone's behalf. (Dkt. 66 ¶ 7). Townstone's loan officers could also generate their own leads, although the extent to which they did so remains disputed.

As part of his duties, Silver would meet with referral sources outside the office two or three times a month, would assist in the production of Hochberg's radio show every five or six weeks, would attend a few seminars every year, and would attend broker open houses a few times a month. (Dkt. 66 ¶ 35). Loan officers were also responsible for researching interest rates in the secondary marketplace. (*Id.* ¶ 40). Loan officers did not play a role in Townstone's internal finances, vendor relations, or human resources, and did not have the authority to make corporate policies. (*Id.* ¶¶ 48–

49). Silver primarily worked from his desk in Townstone's offices, but also had the ability to work from home while remotely accessing his work computer. (*Id.* ¶¶ 14–16).

Townstone considered loan officers to be exempt employees, and therefore did not pay them overtime when they worked more than 40 hours per week. (*Id.* ¶¶ 26, 27). Loan officers were paid a low base salary and commissions on the loans they sold. (*Id.* ¶¶ 30–32). Townstone did not maintain records of how many hours Silver worked, when Silver worked, or whether he was working while he was absent from Townstone's offices. (*Id.* ¶ 55, Dkt. 74 ¶ 1). In 2013, Silver received $110,700 in commissions and $38,500 in salary, for a total compensation of $149,200. (Dkt. 66 ¶ 30).

In March 2013, Hochberg sent an e-mail to the loan officers stating that he wanted everybody to be in the office by 8:00 AM. (Dkt. 53-15). Hochberg subsequently e-mailed the loan officers in September 2013, informing them of a "new rule" providing that loan officers who were not at their desks by 8:30 AM would "get leads that day." (Dkt. 53-12). Additional e-mails demonstrate that Sturner and Hochberg expected employees to work on the weekends and expected employees to forward their office phone to their personal cell phone while out of the office. (Dkt. 53-20; 53-21).

Silver complained, both verbally and in e-mails, about the number of hours he worked and the fact that he did not receive overtime. (Dkt. 53-11, 48:14–53:15). Silver, however, could not recall the particulars of any of these communications nor the names of witnesses to the conversations. (Dkt. 53-11 338:21–339:2; 49:2–12). On February 6, 2014, Silver sent Sturner an e-mail complaining about Townstone's practice of forwarding Silver's office phone to his personal cell phone without Silver's permission. (Dkt. 53-27). In response to the e-mail, Sturner scheduled a meeting with Silver for the next day at 10:30 AM. (*Id.*). However, that same evening Sturner called

3

Silver and informed him that his employment at Townstone was being terminated. (Dkt. 66 ¶ 62). Sturner subsequently testified that Silver was fired "due to compliance issues." (*Id.* ¶ 66).

**Legal Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[m]erely alleging a factual dispute cannot defeat the summary judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**Discussion**

The defendants argue that summary judgment should be granted in their favor because the undisputed material facts establish that Silver is an overtime-exempt employee and that Silver was not retaliated against. Silver, in turn, contends that summary judgment should be granted in his favor because the undisputed material facts establish that he is not an overtime exempt employee and that he was retaliated against.

Under the Fair Labor Standards Act (FLSA), an employee may be exempt from overtime if they are "employed in a bona fide executive, administrative, or professional capacity . . . , or in the capacity of outside salesman . . . ." 29 U.S.C. § 213(a)(1). Townstone contends that Silver is an overtime exempt employee because he is an outside salesman, because he is employed in a bona fide administrative capacity, or because he is employed in a combination of those two roles.

4

Townstone first contends that Silver was overtime exempt because he was an outside sales employee. An outside sales employee is an employee whose primary duty is making sales and who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty. 29 C.F.R. § 541.500(a). Because it is undisputed that Silver's primary duty is making sales, the applicability of this exemption turns on whether Silver is customarily and regularly engaged away from Townstone's place of business in making those sales. For the purpose of this analysis, the phrase "customarily and regularly" has been defined as requiring a frequency which is greater than occasional but less than constant, such that it encompasses work "normally and recurrently performed every workweek" but not "isolated or one-time tasks." 29 C.F.R. § 541.701.

> The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home. Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls. Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property.

29 C.F.R. § 541.502.

> Making sales, however, is not an activity that necessarily occurs at one time and/or in one location, but, rather, may comprise a number of component activities. Where some of those component activities take place at a fixed site and others take place outside of a fixed site, the employee is properly classified as an outside sales employee if the activities occurring outside of the office are critical to the sales process and occur on a customary and regular basis.

*Wong v. HSBC Mortg. Corp. (USA)*, 749 F. Supp. 2d 1009, 1013 (N.D. Cal. 2010) (citations and internal quotation marks omitted). The question of how an employee spends his time is a question of fact, while the question of whether his activities fall within an exemption is a question of law. *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 752 (W.D. Mich. 2003).

5

The undisputed facts establish that Silver worked primarily from Townstone's office or his home office, although Silver would visit a client approximately once per week to pick up documents or obtain signatures. Moreover, Silver would meet with referral sources outside the office "two or three times a month," attend seminars once "every four or five months," attend real estate brokers' open houses "one or two times a month," and attend closings.

As the Department of Labor has noted, there is no suggestion in the regulations that work performed "customarily or regularly" must occupy a given percentage of an employee's weekly working hours. *See* Opinion Letter from Dept. of Labor, Wage and Hour Division (Jan. 25, 2007), 2007 WL 506575. Indeed, courts have found that even minimal consistent outside activities can satisfy the outside sales exemption. *See, e.g. Lint v. Nw. Mut. Life Ins. Co.,* No. 09CV1373, 2010 WL 4809604, at *3 (S.D. Cal. Nov. 19, 2010) (finding that a salesperson who spent approximately 10-20 percent of his time meeting with clients or prospective clients outside of the office qualified for the outside sales exemption); *Taylor v. Waddell & Reed, Inc.*, No. 09CV2909, 2012 WL 10669, at *3 (S.D. Cal. Jan. 3, 2012) (quoting Opinion Letter from Dept. of Labor, Wage and Hour Division (Jan. 25, 2007), 2007 WL 506575) (recognizing that sales related activity occurring outside the office "one or two hours a day, one or two times a week" satisfies the outside sales exemption).

Here, it is undisputed that Silver's primary duty was making sales within the meaning of the exemption, and that Silver engaged in some outside activities incidental to those sales, such as delivering and picking up paperwork and occasionally networking with potential clients. However, the undisputed material facts do not establish whether Silver's external activities were critical to the sales process. Accordingly, a dispute of material fact remains as to whether or not Silver engaged in outside sales activities.

6

The defendants alternatively contend that Silver is an exempt employee because he is employed in a bona fide administrative capacity. The term "employee employed in a bona fide administrative capacity" ordinarily means any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

A relaxed standard, however, exists for "highly compensated" employees who receive a total annual compensation of at least $100,000 a year. 29 C.F.R. § 541.601. Those employees are deemed to be exempt so long as they "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee identified in subparts B, C or D of this part." *Id.* Thus, if the "highly compensated employee exemption" applies, Townstone need only demonstrate either that Silver regularly performed work related to the management or regular business operations of Townstone or that he regularly exercised discretion with respect to matters of significance.

When calculating an employee's annual compensation for the purposes of this exemption, an employer may elect, in advance, to utilize any 52-week period. But when, as here, no election has been made in advance, the calendar year is applied by default.[1] 29 C.F.R. § 541.601(b)(4); *Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1368 (N.D. Ga. 2009). The undisputed facts establish that Silver

---

[1] Townstone asserts that 29 C.F.R. § 541.601 only requires an employer to select a 52-week calculation period in advance of a decision on the merits. This assertion is unsupported by the authorities that Townstone offers, is contrary to persuasive authority from other jurisdictions, and is fundamentally illogical. Rather, this Court interprets "in advance" as requiring, at absolute minimum, that a period be designated prior to the initiation of the administrative or legal proceeding requiring the application of the election.

was paid $149,200 in 2013, and that the highly paid employee exemption therefore applied in 2013. It is unclear, however, what Silver's prorated salary was in 2012 or 2014.

Turning first to the standard administrative employee exemption, this Court notes that it is undisputed that Silver's primary job duty was sales, a fact confirmed by Townstone's assertion that the outside sales exemption applies to Silver's employment. Because, by definition, an employee cannot have multiple primary duties, Silver's primary duty therefore could not have been the performance of office or non-manual work relating to the management or operation of Townstone Financial. *See* Opinion Letter from Dept. of Labor, Wage and Hour Division (March 24, 2010), 2010 WL 1822423 (recognizing that loan officers' primary duty is selling financial products). Based on the undisputed facts before it, this Court therefore could not conclude that Silver is exempt if the standard administrative exemption applies.

To satisfy the highly compensated employee exemption, Silver need only prove that he regularly performed work related to the management or regular business operations of Townstone or that he regularly exercised discretion with respect to matters of significance. Substantial disputes of material fact remain, however, regarding the nature of Smith's non-sales duties and the extent of discretion that he exercised. Accordingly, disputes of material fact remain regarding the applicability of the administrative employee exemption.

Townstone also contends that, if the outside sales exemption or the administrative exemption do not apply, Silver is nonetheless subject to the combined exemption. The combined exemption applies to employees whose primary duties constitute a combination of exempt duties, neither of which individually would constitute the employee's primary duty. 29 C.F.R. § 541.708; *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631–32 (7th Cir. 2010). Because this Court concludes that disputes of material fact remain with respect to the applicability of both of those exemptions, disputes of material fact therefore also remain with respect to the combined exemption.

8

Finally, both parties ask this court to grant summary judgment in their favor on Silver's retaliation claim.[2] To establish a prima facie case for retaliatory discharge, a plaintiff must demonstrate that he was engaged in statutorily protected expression, that he suffered an adverse action by his employer, and that there was a causal link between the protected expression and the adverse action. *Rennie v. Dalton,* 3 F.3d 1100, 1109 (7th Cir. 1993). Here, it is undisputed that Silver's termination constituted an adverse action by his employer. Townstone contends, however, that there is no evidence in the record suggesting that Silver was engaged in statutorily protected expression. Employee's complaints constitute protected expression only when they contain "some degree of formality" such that "the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Kasten v. Saint-Gobain Performance Plastics Corp.,* 563 U.S. 1, 14, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011). An employee's complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id.*

Here, Silver testified that he had complained about the hours work and complained to Hochberg and Sturner that he was not receiving overtime. Silver, however, could not recall the particulars of these communications beyond the general gist that he was working extra time that "we are working all this extra time and we are not being paid for it" and that "we are working long hours and I deserve to be paid overtime."

These general statements, however, are inadequate to establish that a reasonable employer could conclude that Silver was asserting a legal right to overtime pay. To the contrary, Silver's statements communicate only that he believed he deserved to receive overtime compensation, not

---

[2] This Court notes that the defendants filed a separate motion for summary judgment on this issue, which was denied by the Court as untimely. However, in the interest of justice the defendants were granted leave to incorporate their arguments in favor of summary judgment on this count into their response to the plaintiff's motion for summary judgment.

that he had a statutory right to do so. S*ee Kasten,* 563 U.S. at 14; *see also Cotto v. John C. Bonewicz, P.C.,* No. 13 C 842, 2015 WL 3609167, at *9 (N.D. Ill. June 9, 2015) (Durkin, J.) (recognizing that general complaints about wages and hours are insufficient to notify a reasonable employer that an employee is asserting his rights under the Fair Labor Standards Act). Moreover, Silver's e-mail to Sturner immediately prior to his termination did not raise the question of paid overtime at all, but instead was focused on Townstone's practice of forwarding employee's office phones to their personal cell phones after regular business hours. Accordingly, the undisputed material facts do not establish that Silver engaged in an act of protected expression and therefore do not support Silver's retaliation claim.

**Conclusion**

For the foregoing reasons, the Defendants' motion for summary judgment is denied with respect to Counts I and II and granted with respect to Count III. Silver's motion for summary judgment is denied in its entirety.

IT IS SO ORDERED.

Date: August 8, 2016

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge